# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:04CV322-H

| | |
|---|---|
| **WATERFRONT PROPERTIES, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | **MEMORANDUM AND ORDER** |
| ) | |
| **XEROX CONNECT, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**THIS MATTER** is before the Court on the Defendant's "Motion for Summary Judgment" (document #15), "Memorandum in Support ... " (document #16), "Motion to Exclude Testimony of Plaintiff's Expert Witness" (document #13), and "Memorandum in Support ... " (document #14), all filed November 14, 2005; and the "Plaintiff's Response to Defendant's Motion for Summary Judgment and ... Motion to Exclude Testimony ..." (document #17) filed December 8, 2005.

On January 17, 2006, the Defendant filed its "Reply ..." (document #20).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for determination.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Defendant's "Motion to Exclude Testimony of Plaintiff's Expert Witness" (document #13), but will <u>grant</u> the Defendant's "Motion for Summary Judgment" (document #15), as discussed below.

## I. FACTUAL AND PROCEDURAL HISTORY

This is a breach of contract action filed in federal court pursuant to diversity jurisdiction. The

Plaintiff, Waterfront Properties, Inc., is a North Carolina corporation headquartered in Charlotte that is in the business of developing and selling real property. The Defendant, Xerox Connect, Inc., is a Pennsylvania corporation that designs and sells computer software and hardware and provides accompanying software services.

Taking the facts in the light most favorable to the Plaintiff, in 1999 it entered into a series of contracts with the Defendant. In these contracts, the Defendant agreed to provide the Plaintiff with preexisting software that the Defendant would adapt to the Plaintiff's needs. Specifically, the Defendant was to provide customized databases in which employees in Plaintiff's satellite offices in Virginia and South Carolina could enter information about sales prospects and activities, and then link that information to specific properties.

Sometime in May 1999, the parties entered into a Master Professional Services Agreement (the "Contract"), which governed the provision of services to the Plaintiff and contemplated the execution of a separate contract which would define the scope and the price of that work. The Contract explicitly disclaimed all warranties except the following express warranty: "[s]ervices will be performed in a skillful and workmanlike manner according to those standards generally prevailing among consultants performing similar services under similar circumstances."

Sometime in August 1999, the parties executed an agreement entitled "Statement of Work/Functional Design Specification ['SOW'] for the Sales and Marketing Management System ['SMMS']," which defined the scope of the project and the specific functional requirements of the database program and was governed by the general terms of the Master Contract. Neither the Contract nor the SOW contained any requirement related to the time required to input data.

The SOW included the purchase of Lotus Notes software and required the Defendant to

customize that program for the management of the Plaintiff's sales activities and properties.

In anticipation of the new SMMS, the parties also entered into a contract for the provision of hardware and network connectivity, the "LAN Infrastructure Proposal for Waterfront Properties" ("LAN Contract"), pursuant to which Defendant and a separate supplier, KB Systems, agreed to supply the Plaintiff with computers and network hardware.

In December 1999, the Defendant made its first "roll out" of the software, and by the end of May 2000, the hardware and software had been fully installed. In the light most favorable to the Plaintiff, at the time of the initial "roll out," some of its employees requested that the software be made less "cumbersome," that is, the employees expressed a preference for fewer "screens" on their computer monitors while inputting data. However, at no time did the Plaintiff refuse to accept or otherwise reject any of the hardware or software.

Under the three contracts, the Plaintiff paid Defendant a total of $169,402: $30,575 for hardware and $138,827 for the Lotus Notes licenses and the development of the SMMS. The final payment was made, without protest of any kind, on May 18, 2000.

Sometime in November 2000, the Plaintiff contacted the Defendant, again complaining that the databases were "cumbersome," that is, complaints were registered six months after the final payment regarding the amount of time required to input marketing and other data into the databases. At no time prior to filing the Complaint, however, did the Plaintiff reject the software or hardware, or request even a partial refund. Instead, taking the facts in the light most favorable to the Plaintiff, it has retained the hardware and software through the present date, and its employees used the hardware and, at least some of the software, through sometime in July 2004 – more than four years after the final payment was made on the subject contracts.

On July 2, 2004, the Plaintiff filed its Complaint alleging a single claim for breach of contract, contending that the hardware and software did not function as warranted, and seeking to recover $169,402, the entire contract price.

On November 14, 2005, the Defendant filed its Motion for Summary Judgment which as clarified in the parties' briefs, presents a single issue: whether the Plaintiff's breach of contract claim is barred by North Carolina's Uniform Commercial Code ("UCC") due to the Plaintiff's failure to seek rescission of the Contract or otherwise revoke its acceptance of the hardware and software within a reasonable time. The same day, the Defendant also filed a Motion to Exclude the Testimony of the Plaintiff's Expert, Seth Miller. However, the undersigned has considered Mr. Miller's opinion concerning the software's alleged "cumbersomeness," discussed above, and therefore will <u>deny</u> the Defendant's Motion to Exclude his testimony.

In its "Response," the Plaintiff essentially maintains that the UCC does not apply to its breach of contract claim because the parties' agreements related to the provision of "services," not "goods." However, the Plaintiff has not addressed whether notice was given within a "reasonable" time and thus appears to concede that, if properly characterized as a contract for "goods" rather than "services," the UCC would bar its claim. <u>See</u> Document # 17 at 4-8.

The Defendant's Motion for Summary Judgment has been fully briefed as set forth above and is, therefore, ripe for disposition.

## II. <u>DISCUSSION</u>

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as

4

to any material fact and ... the moving party is entitled to a judgment as a matter of law." Accord Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50. Moreover, it is well settled that "affiants' statements [must be] made based on personal knowledge" and may not merely repeat the non-moving party's allegations. See Bryant v. Bell Atlantic Maryland, Inc., 288 F.3d 124, 135 (4th Cir. 2002) (considering disputed affidavits which were based on affiants' personal knowledge).

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

It is axiomatic that under a contract governed by the UCC, the buyer must pay for any goods it accepts. N.C. Gen. Stat. § 25-2-607. Acceptance occurs when the buyer "does any act inconsistent with the seller's ownership." N.C. Gen. Stat. § 25-2-606. Revocation of acceptance requires notice within a reasonable time to the seller. Accord Alberti v. Manufactured Homes, Inc., 329 N.C. 727,

407 S.E.2d 819 (1991) (revocation "is not effective until the buyer notifies the seller of it"); Noland Co., Inc. v. Poovey, 54 N.C.App. 695, 705, 282 S.E.2d 813, 820 (1981) (revocation "must be within a reasonable time after their delivery or tender [and] ... is ineffective unless the buyer seasonably notifies the seller"); Ace Chemical Corp. v. Atomic Paint Co., 31 N.C. App. 221, 224, 229 S.E. 2d 55, 57 (1976); ITT-Indus. Credit Co. v. Milo Concrete Co., Inc., 31 N.C.App. 450, 461, 229 S.E.2d 814, 822 (1976); and HPS v. All Wood Turning Corp., 21 N.C. App. 321, 324, 204 S.E. 2d 188, 190 (1974) ("[r]evocation of acceptance must be made within a reasonable time after the buyer discovers, or should have discovered, the ground for it").

As the Plaintiff appears to concede, its delay in revoking acceptance of the software and hardware until years after they were received, was not "reasonable" under the UCC. See, e.g., Ace Chemical Corp., 31 N.C. App. at 224, 229 S.E. 2d at 57 (where defendant waited one month after it discovered nonconformity to notify plaintiff seller that goods were nonconforming, and used the goods in the interim, "defendant did not notify seller of the nonconformity within a reasonable time after it discovered or should have discovered the nonconformity"); and ITT-Indus. Credit Co., 31 N.C.App. at 461, 229 S.E.2d at 822 (notice of revocation given five months after delivery was not given "within a reasonable time").

The remaining question is whether the contracts at issue in this case – which, as the Plaintiff argues, must be considered in the aggregate – are governed by the UCC, which applies only to the sale of "goods," defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." N.C. Gen. Stat. § 25-2-105(1).

Under both federal and state governing authority, in determining whether the UCC applies to contracts that involve the provision of both goods and services, courts are to consider a contract's

6

predominant factor, thrust, or purpose. See, e.g., Princess Cruises, Inc. v. General Electric Co., 143 F.3d 828, 833 (4th Cir. 1998) (in analyzing mixed contract for goods and services, court must determine whether the predominant purpose of the transaction is the sale of goods, and "when the predominant purpose of a ... contract is the rendering of services rather than the furnishing of goods, the UCC is inapplicable"); Parks v. Alteon, Inc., 161 F.Supp.2d 645, 649 (M.D.N.C. 2001) (applying predominant purpose test); and Hensley v. Ray's Motor Co., 158 N.C. App. 261, 265, 580 S.E.2d 721, 724 (2003) (adopting "predominant factor ... thrust [and] ... purpose" test), citing Bonebrake v. Cox, 499 F.2d 951 (8th Cir. 1974).

As discussed above, the predominant thrust of the parties' agreements was the sale of hardware and "custom software." That being the case, unless there is a legal basis for excluding a mixed contract (for goods and some services, as here) from UCC governance, in the absence of revocation within a "reasonable" time, there is no legal basis for rescission of the subject contract.

The Plaintiff has cited no Fourth Circuit or North Carolina authority addressing whether a mixed contract for the provision of custom software falls within the UCC, and the undersigned is aware of none. However, other circuit courts considering the issue have held that such contracts are governed by the UCC. See, e.g., Micro Data Base Sys., Inc. v. Dharma Sys., Inc., 148 F.3d 649, 654-55 (7th Cir. 1998) (in context of custom software, UCC governs disputes because sale of goods predominates over the service portion of agreement); Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670 (3rd Cir. 1991) (even where contract also provided for provision of services, "[t]he importance of software to the commercial world and the advantages to be gained by the uniformity inherent in the [UCC] are strong policy arguments favoring inclusion ... within the definition in the [UCC]"); and RRX Indus., Inc. v. Lab-Con, Inc., 772 F.2d 543, 546 (9th Cir. 1985) ("the employee training, repair

services, and system upgrading were incidental to sale of the software package and did not defeat characterization of the system as a good").

Applying these legal principles to the facts taken in the light most favorable to the Plaintiff, as we must at this stage of the proceedings, its contracts with the Defendant, which called for the provision of custom computer software, and attendant hardware, are contracts predominately for goods which are governed by the UCC. The Plaintiff was required, therefore, to give reasonable notice of its revocation of acceptance of the software and hardware, and having failed to do so, and instead retaining and using those items for years following their receipt, it may not now seek to recover the contract price. Accord N.C. Gen. Stat. § 25-2-606 and 607; Alberti, 329 N.C. at 727, 407 S.E.2d at 819; Noland Co., Inc., 54 N.C.App. at 705, 282 S.E.2d at 820; Ace Chemical Corp., 31 N.C. App. at 224, 229 S.E. 2d at 57; ITT-Indus. Credit Co., 31 N.C.App. at 461, 229 S.E.2d at 822; and HPS, 21 N.C. App. at 324, 204 S.E. 2d at 190.

### III. ORDER

**NOW THEREFORE, IT IS ORDERED:**

1. The Defendant's "Motion to Exclude Testimony of Plaintiff's Expert Witness" (document #13) is **DENIED**.

2. The Defendant's "Motion for Summary Judgment" (document #15) is **GRANTED**; and the Complaint is **DISMISSED WITH PREJUDICE**.

3. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED**.

Signed: January 31, 2006

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge